# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

Dawn T.,                                    )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )    No. 18 CV 50101
                                            )    Magistrate Judge Iain D. Johnston
Andrew Saul,                                )
Commissioner of Social Security,            )
                                            )
        Defendant.                          )

## MEMORANDUM OPINION AND ORDER

The digital clock radio flips from 5:59 to 6:00 a.m.

Sonny & Cher's "*I Got You Babe*" starts to play.

It's *Groundhog Day*.[1]

---

[1] This Court is not alone in citing *Groundhog Day*. Of course, the copyright litigation involving the movie itself cited the movie. *Arden v. Columbia Pictures*, 908 F. Supp. 1248 (S.D.N.Y. 1995) (granting defendant's summary judgment motion on the infringement claims). But case law is full of references to *Groundhog Day*. Federal courts across the country have referenced the movie. *Atl. Sounding Co. v. Townsend*, 496 F. 3d 1282, 1286 (11th Cir. 2007) (Carnes, concurring); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 631 (S.D.N.Y. 2018); *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1273 (N.D. Fla. 2018) (containing a nearly identical introduction; great minds think alike); *Caires v. FDIC*, 298 F. Supp. 3d 79, 81 (D.D.C. 2018); *United States v. Conigliaro*, 282 F. Supp. 3d 401, 405 (D. Mass. 2017); *Anderson v. Greene*, No. 14 Civ. 10249, 2017 U.S. Dist. LEXIS 130590, at *2 (S.D.N.Y. Aug. 16, 2017); *Estate of Jackson v. GE Capital Corp.*, 569 B.R. 904, 905 (M.D. Fla. 2016); *First Chi. Bank & Trust v. Leibowitz*, No.11 C 1976, 2011 U.S. Dist. LEXIS 45190, at *1 (N.D. Ill. Apr. 21, 2011); *Abrams v. Ciba Specialty Chems. Corp.*, 659 F. Supp. 2d 1225, 1232 n. 12 (S.D. Ala. 2009). State courts have likewise taken a shine to citing the movie. *Douglas v. Tractmanager, Inc.*, C.A. No. 9073-ML, 2014 Del. Ch. LEXIS 94, at *1 (Del. Ch. May 30, 2014); *Hooten v. Safe Auto Ins. Co.*, 1st Dist. Hamilton No. C-010576, 2004-Ohio-451, ¶ 32 (Feb. 6, 2004) (Sundermann, J., dissenting); *Baden v. Dorflinger*, 447919, 2004 Conn. Super. LEXIS 3759, at *2 (Conn. Super. Ct. Dec. 21, 2004). Florida state courts seem to particularly like the movie. *See, e.g., Miccosukee Tribe v. S. Fla. Water Mgmt. Dist.*, 48 So. 3d 811, 832 (Fla. 2010) (Lewis, concurring); *Strand v. Escambia County*, 992 So. 2d 150, 163 (Fla. 2008) (Lewis, dissenting); *Dep't of Corr. v. Daughtry*, 954 So. 2d 659, 662 (Fla. Dist. Ct. App. 2007). And even Justice Scalia—of course—got into the act. *See, Glossip v. Gross*, 135 S.Ct. 2726, 2746 (Scalia, concurring). Counsel have referenced *Groundhog Day* to courts. *Ritchie Risk-Linked Strategies Trading, Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 78 (S.D.N.Y 2012); *Hall v. State*, No. E2012-01131-CCA-R3-PC, 2013 Tenn. Crim. App. LEXIS 263, at *8 (Tenn. Crim. App. Mar. 25, 2013). Not to be outdone, litigants and witnesses reference *Groundhog Day* in litigation. *See, e.g., Portland Pipe Line Corp. v. City*

For good reasons, there was no cinematic sequel to *Groundhog Day*.[2]  In addition to

transformation, redemption and morality, among other themes,[3] at least to the Court, a point of

the movie was to move forward and not commit the same errors of the past.[4]

Unfortunately, the same cannot be said of many Social Security appeals.  Three years

ago, this Court referenced *Groundhog Day* when remanding a Social Security appeal.  *Booth v.*

*Colvin*, No. 14 CV 50347, 2016 U.S. Dist. LEXIS 82754 (N.D. Ill. Jun. 27, 2016).  (The irony of

repeatedly referencing *Groundhog Day* is not lost on the Court.)  The Court noted the repeated

mistakes the Social Security Administration ("SSA") and its administrative law judges ("ALJs")

made not only in different cases but also in the same cases—even after courts specifically

identified the errors and how to correct them.  *Booth*, 2016 U.S. Dist. LEXIS 82754 at *8-10.

Indeed, this Court has identified numerous cases in which remands have been entered more than

_____

*of S. Portland*, 288 F. Supp. 3d 322, 381 (D. Me. 2017); *Hill v. Emory Univ.*, No. 06 CV 1699, 2008 U.S.
Dist. LEXIS 128173, at *4 (N.D. Ga. 2008); *People v. Lopez*, E062323, 2016 Cal. App. Unpub. LEXIS
1884, at *5 (Cal. Ct. App. Mar. 15, 2016).  Indeed, the term "*Groundhog Day* litigation" is a common,
derogatory description of litigation in which parties persistently repeat their actions, arguments or errors.
*See, e.g., United States ex rel. Griffith v. Conn*, 117 F. Supp. 3d 961, 988 (E.D. Ky. 2015); *Lefer v. Murry*,
978 F. Supp. 2d 1177, 1186 (D. Mont. 2013).  Hopefully, Bryan Garner will take note and include the
term "*Groundhog Day* litigation" in an upcoming edition of *Black's Law Dictionary*.  Judge Lucy Koh
used *Groundhog Day* less pejoratively when she imposed *Groundhog Day* rules in the retrial of Apple v.
Samsung, in which the parties were limited to the evidence presented at the first trial—nothing new.  *See,*
*e.g., Apple Inc. v. Samsung Elecs. Co.*, 2018 U.S. Dist. LEXIS 57070, at *88, 100 (N.D. Cal. Apr. 2,
2018).  Finally, a well-deserved hat tip goes to Judge Watkins who entered his *Groundhog Day* order on
February 2. *See Crooked Creek Props. v. Ensley*, No.16 CV 905, 2017 U.S. Dist. LEXIS 14306 (M.D.
Ala. Feb. 2, 2017).
[2] Allegedly, a video game sequel will be released later in 2019. *Groundhog Day (film)*, WIKIPEDIA
(https://en.wikipedia.org/wiki/Groundhog_Day_(film)#Video_game_sequel) (last visited Aug. 23, 2019).
[3] A lot of ink has been spilled discussing the religious, philosophical, and moral themes of this movie.
*See, e.g.* Michael Faust, *Groundhog Day*, PHILOSOPHY NOW,
https://philosophynow.org/issues/93/Groundhog_Day (last visited Aug. 23, 2019); Jonah Goldberg, *A*
*Movie for All Time*, NATIONAL REVIEW (Feb. 2, 2006) https://www.nationalreview.com/2006/02/movie-
all-time-jonah-goldberg-2/.  That kind of analysis is beyond this Court's jurisdiction.
[4] Additionally, after completing the movie, because of a falling out, Bill Murray stopped speaking to
Harold Ramis for years, leaving Ramis understandably heartbroken. Violet Ramis Steil, *Ghostbuster's*
*Daughter: Life With My Dad, Harold Ramis* (Blue Rider Press 2018). Regrettably, it took Ramis'
impending death for the two to reconcile. *See* Mark Caro, *Harold Ramis, Chicago Actor, Writer and*
*Director, Dead at 69*, CHICAGO TRIBUNE (Feb. 24, 2014, 10:35 PM)
https://www.chicagotribune.com/entertainment/chi-harold-ramis-dead-20140224-story.html.

once with clear directions only to have the SSA and the ALJs commit the same errors, resulting, not surprisingly, in yet another appeal. *Wallace v. Colvin*, 193 F. Supp. 3d 939, 941-42 (N.D. Ill. 2016). Regrettably, this is not a new phenomenon or one limited to the district courts. Even the Seventh Circuit has been subjected to this practice. *See, e.g., Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998).

A reasonable person would think that when a court remands a case to the SSA and provides clear directions as to how the ALJ should proceed on remand, the ALJ would do so. Sadly, it appears expecting the SSA to act reasonably may be a lost cause.

Unhappily, there are many losers in this process. Obviously, the claimants are losers. But the taxpayers are also losers as they must pony up attorneys' fees to claimants' counsel under the Equal Access to Justice Act, 28 U.S.C. Section 2412, as well as fund the salaries of all the government employees involved in these cases. *See Wallace*, 193 F. Supp. 3d at 943.

At a recent Federal Magistrate Judges Association conference, representatives from the SSA repeatedly assured those present that the ALJs read the remand orders. Many magistrate judges in attendance were skeptical. This Court is now confident that either those representations were not entirely accurate or that some ALJs do, in fact, read the remand orders but just choose to ignore them, which may be even worse.

As much as this Court enjoys referencing *Groundhog Day* and reminiscing about Woodstock, Illinois and the friends who lived there, the Court would rather move forward and not return to Ned's corner.

*       *       *

In 2009, plaintiff filed her initial claim for disability benefits, alleging two primary impairments—fibromyalgia, which causes a range of symptoms including pain, fatigue, and concentration problems; and lymphedema, specifically leg swelling, which she treats with a mixture of methods, including elevating her feet and wearing hip-length compression boots. From 2009 until 2017, plaintiff has seen numerous doctors (but has no consistent treating physician) and has tried various treatments without obtaining any long-lasting improvement.

Before the Court is plaintiff's third appeal from a ruling by an ALJ. This case is now 10 years and running. To recap, in 2011, the first ALJ denied plaintiff's claim, finding in a 10-page ruling that plaintiff could do sedentary work subject to certain limitations, including that she be allowed to sit or stand for 1 to 2 minutes every hour (to address the leg swelling) and that she be limited to simple, repetitive, routine tasks (to address concentration problems). Plaintiff appealed that ruling here. After plaintiff filed her opening brief raising several arguments for a remand, the Government agreed to a voluntary remand without further briefing, implicitly conceding that the ALJ's first decision was flawed in some respects. On remand, the same ALJ presided over a second hearing. In October 2014, in an 18-page ruling, that ALJ again found plaintiff not disabled, largely on the same grounds as the first decision. The decision differs in some respects—for example, the sit-stand option was changed from every hour to every three hours. R. 553.

Plaintiff filed a second appeal to this Court. *See* Case No. 15-50248. Her arguments were similar to those raised in the first appeal. In February 2017, after full briefing, this Court agreed with plaintiff and ordered a remand with several specific instructions, including that the ALJ must call an impartial medical expert to testify at the third hearing.

On remand, a new ALJ took over the case. After conducting a new hearing, at which Dr. Ashok Jilhewar testified, the ALJ found plaintiff was able to do sedentary work. The broad outlines are similar to the first two decisions, although some minor differences exist. For example, this ALJ omitted a sit-stand option and did not include a limitation for simple tasks.[5]

In this appeal, plaintiff raises seven specific arguments for a remand.[6] Although the blunderbuss opening brief is longer (now up to 30 pages) and the arguments even more numerous than the first two appeals, plaintiff raises the same basic criticisms. Plaintiff argues that one possible remedy is to again remand the case for another hearing and ruling. This would be the fourth trip through the administrative system. However, plaintiff believes a stronger remedy is needed. Plaintiff asks this Court to remand with instructions that the Commissioner award benefits outright—*i.e.* no further proceedings. Plaintiff argues that the Commissioner has repeatedly failed to correct its mistakes and should not be given "endless opportunities to get it right." Dkt. #18 at 30. In effect, it's three strikes and you're out.

## DISCUSSION

The Court will not systematically go through all of plaintiff's seven arguments in the exact order presented. Instead, the Court will highlight those arguments it finds most persuasive.

A good starting point is plaintiff's broader criticism that the ALJ "conflated" her two primary impairments (lymphedema and fibromyalgia) and thereby gave less attention to the

---

[5] This Court's 2017 decision contains a more complete description of the procedural and factual history. Here, the Court will discuss the facts only as needed to explain particular points.

[6] As quoted from plaintiff's opening brief, they are the following: (1) "The ALJ Ignored an Entire Line of Evidence Supporting Leg Edema"; (2) "The ALJ Erred in Failing to Recognize the Pain Associated with her Edema"; (3) "The ALJ and Dr. Jilhewar are Incorrect Regarding Good and Bad Days"; (4) "The ALJ Erred in Relying on Normal Findings When Considering FMS"; (5) "The ALJ's [sic] Ignores Fatigue/Fog/Memory Issues Associated with FMS"; (6) "The ALJ's [sic] Erred in Affording Dr. Crowe's Opinion Little Weight"; and (7) "The ALJ's [sic] Erred in Dismissing Plaintiff's and Third Party Testimony." Dkt. #18 at i. FMS is an abbreviation for fibromyalgia syndrome.

fibromyalgia allegations.[7] Dkt. #18 at 23. The Court agrees. This Court's 2017 decision raised this same concern, noting that the fibromyalgia issue was "at the heart of this case." R. 1099. The decision noted that the ALJ (*i.e.* the prior ALJ) "gave mixed signals"—on the one hand, agreeing at Step Two that plaintiff had established that she was properly diagnosed with fibromyalgia, but then on the other hand, making comments in the rest of the decision casting doubt on this conclusion. *Id.* Given this underlying tension, the Court stated that the "obvious starting point" for the ALJ on remand was to utilize SSR 12-2p, which provides a roadmap for how to analyze these issues and includes two specific tests for determining whether a claimant has fibromyalgia. R. 1100. (The fact that the Court is repeatedly required to direct the SSA and the ALJs to follow their own rulings is troubling. It should not be difficult for an agency to follow its own rules.) However, despite these instructions, the ALJ did not discuss SSR 12-2p, nor apply either of its two tests. The calling of Dr. Jilhewar as the expert witness arguably strengthened the analysis of the lymphedema issues, but it did not provide much help regarding the fibromyalgia allegations. Dr. Jilhewar began his testimony by immediately focusing on plaintiff's edema. His comments about the fibromyalgia were brief and technical.[8] In the 2017 decision, this Court required the ALJ to call an expert, and recommended that the ALJ call a rheumatologist given the central role fibromyalgia played in the case. That recommendation was ignored. Dr. Jilhewar is not a rheumatologist. R. 1029. Dr. Jilhewar is certified in internal medicine and gastroenterology. R. 1029.

---

[7] At the third hearing, plaintiff testified that the fibromyalgia was her "worst enemy." R. 1021.

[8] For example, as the ALJ summarized, "[Dr. Jilhewar] stated that the fibromyalgia is secondary in this case and reported that Exhibit 1F, p. 12 showed positive antibodies at 160 but negative ANA." R. 978. The ALJ did not explain what this testimony means. It is technical and, to this Court's layperson eyes, seems to waffle in opposite directions, without taking a clear stand.

Turning to the specific arguments, the Court finds that the ALJ committed several errors commonly seen in fibromyalgia cases. Many of them are interrelated and reinforce each other.

**Failure To Acknowledge That Plaintiff Had Good and Bad Days.** This issue was raised in previous appeals. In the 2017 decision, this Court agreed with plaintiff that the ALJ had "repeatedly" failed to consider plaintiff's allegations "that she experienced 'good days' and 'bad days' with a large fluctuation in symptoms and daily activities." R. 1103. Further, the Court rejected the ALJ's conclusory assertion that no objective evidence "substantiated" plaintiff's allegations, noting that doctors often rely on a patient's subjective reports in treating fibromyalgia. R. 1104. The Court noted that plaintiff's treating physician, Dr. Crowe, and her friend, Renee Palmer, provided support for plaintiff's allegations. Again, the same errors were made.

The ALJ addressed the "good days/bad days" argument with the following analysis (the Court has added labels to identify the three rationales):

> The claimant testified that she has good days and bad days. She stated that she experienced 4-5 good days a week in 2009 and currently has two good days a week. The claimant explained that a good day is when she can get things done and a bad day is when she has difficulty performing simple tasks. **[Reason #1]** Dr. Jilhewar acknowledged this complaint but testified that the record does not show specific documentation of good and bad days. **[Reason #2]** It is noted that the claimant herself did not fully describe her ability to function on a bad day and only stated that she has difficulty performing simple tasks on these days. **[Reason #3]** In reviewing the record as a whole, the undersigned finds that the number of examinations which have shown good range of motion, a normal gait, no synovitis, and mild swelling as set forth above, might encompass good as well as bad days.

R. 992.

Although this analysis is nominally different from that in the two prior decisions, it is still insufficient. As an initial point, the ALJ did not clearly set forth his bottom-line conclusion. He

seems to have believed that plaintiff had *no* bad days, which if true, is a strong position to take. In any event, the three reasons are not availing.

Reason #1—Dr. Jilhewar's statement that there was no "specific documentation"—is vague. What type of documentation was Dr. Jilhewar expecting to find? He provided no explanation. Moreover, he did not confront plaintiff's argument that, in fact, documentation was available. In plaintiff's opening brief, she provided a long list of record citations. *See* Dkt. #18 at 26 (listing 30 separate citations). For example, on November 23, 2009, Dr. Crowe wrote down separate 1-to-10 pain rankings to differentiate plaintiff's pain on good and bad days. R. 360.[9] Neither the ALJ nor Dr. Jilhewar seriously confronted this line of evidence.

Reason #2—that plaintiff did not "fully" describe her bad days—is also a non-starter. Plaintiff provided both general and specific testimony. *See* R. 1022-23 ("I can get stuff done if it's a good day. If I can't get stuff done or if I get up and it takes a lot of energy just to do simple tasks, then it's bad day."). More specifically, she described how, on a bad day, she had to use a cane while grocery shopping, and after a while, had to lean on the cart and stop and take breaks. R. 1022. She stated that on a bad day she just sat on a couch. R. 983. Additionally, at the third hearing, plaintiff's friend Jamie Wilkins testified that on bad days plaintiff would ask her to come over and help clean the house. *Id.* It is unclear how much more detail the ALJ was hoping to hear. But if the ALJ believed the above testimony was too vague, then the ALJ had an easy way to fix the problem—ask a few follow-up questions. The ALJ did so on other topics. Plaintiff has now testified at three administrative hearings over a six-year period.  This should have provided enough opportunity to build the factual record on this issue.[10]

---

[9] Plaintiff made the same argument in her first appeal. *See* Case No. 13-50007, Dkt. #11 at 11.
[10] The Government brushes off plaintiff's criticisms of Reason #2 by characterizing it as a "single, supplemental remark" and asks that it be forgiven under the harmless error doctrine. Dkt. #27 at 11.

Reason #3 is a riddle. It begins with the observation that there were some "normal" examination findings (a separate topic to be discussed next) and then pivots from this fact to reach the conclusion that these findings "*might* encompass good as well as bad days." The Court is unsure what point the ALJ was intending to make. The word "might" makes it hard to prove or disprove the ALJ's rationale. If anything, this statement seems to support plaintiff's theory that normal findings were explainable by plaintiff having a good day and not because her problems were not severe. Ultimately, this third rationale has the same malleability as a fortune cookie aphorism.

To sum up, the ALJ was on notice from this Court's 2017 decision that the "good days/bad days" issue should be addressed more thoroughly, but the ALJ's three reasons do not meet this standard. The main problem is that the ALJ seems to be rejecting plaintiff's claim that she had bad days at all or, if she did, that they were irrelevant to the analysis. This is a hard position to defend, especially with an impairment like fibromyalgia. Perhaps, if the ALJ had taken a more nuanced position—for example, challenging the frequency or severity of the bad days—then it might be a different matter.[11] This issue is important because it potentially affects other topics, such as the objective evidence (if there were good and bad days, then some normal findings would still be consistent with plaintiff's theory); activities of daily living (it would explain why plaintiff sometimes could do certain activities); and Dr. Crowe's opinion (her treatment notes might reflect some normal findings).

**Objective Evidence.** The ALJ clearly placed much weight on the supposed lack of objective evidence. After stating that this evidence did not support plaintiff's testimony, the ALJ

---

[11] The ALJ noted at one point that plaintiff "had more good days than bad in 2009" and that the bad days worsened over the years. R. 983. This statement hints at a possible argument about frequency, but the ALJ never developed the argument.

then provided a long chronological summary of the medical visits from 2009 to 2017. This is the bulk of the decision. As is often the case in disability decisions, the summary is fact-heavy and analysis-light, leaving the Court unsure about which micro-facts are critical to the diagnoses being offered. The rhetorical pattern is to describe the abnormal findings from an office visit, and then to contrapuntally list the normal findings from that same visit, as if the latter findings had the power to wash away or overshadow the former. But the ALJ did not establish that the particular normal findings being relied on were relevant to fibromyalgia. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining the significance of particular medical findings themselves").

One of the few places where the ALJ was more explicit in identifying which pieces of objective evidence were significant was in discussing Dr. Crowe's opinion. There, the ALJ identified synovitis as the key finding.[12] The ALJ stated that "the record documents many instances of not synovitis seen." R. 993. By singling out synovitis, the ALJ presumably viewed it as a significant marker. But the critical missing link is a medical opinion confirming that this symptom was important. Dr. Jilhewar did not place weight on this metric, nor is it highlighted in SSR 12-2p. Instead, SSR 12-2p refers to trigger points, and on this metric, there were findings supporting plaintiff's claims.[13]

The danger of uncritically accepting normal findings is one that both the Seventh Circuit and this Court have repeatedly emphasized. Plaintiff's opening brief cites to some of these such

---

[12] *Stedman's Medical Dictionary* defines synovitis as follows: "Inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." 1920 (28th ed. 2006).

[13] *See, e.g.* R. 985 (Dr. Rafiq: "There was triggered point tenderness on the upper shoulder area bilaterally and on the lower back bilaterally"); R. 985 (Dr. Hovis: finding "tenderness in her hands, wrists, elbows, shoulders, knees, and feet, as well as control points throughout").

cases.[14] The Government responds by arguing that, although it is true that ALJs should not over-emphasize the lack of objective evidence, they still may rely on this evidence as one part of a larger analysis. To support this argument, the Government cites to two cases, one from the First Circuit and the other from the Sixth Circuit, neither of which is a Social Security disability case.[15] The Government does not respond to, or attempt to distinguish, the cases from this Circuit. Reliance on out-of-circuit case law is an indicator that the Government is asking this Court to stretch, change or ignore controlling precedent, which this Court will not do. But the bigger problem is not with the abstract proposition that the objective evidence is relevant to some degree, a point this Court agrees with, but with the indiscriminating way the ALJ relied on it here.

The ALJ's decision did not acknowledge this issue in any way. This is not a criticism that comes out of the blue. In the 2017 decision, the Court criticized the ALJ because she "provided no explanation as to what objective tests should have been performed" to confirm plaintiff's subjective allegations. R. 1104. Despite this statement, neither Dr. Jilhewar nor the ALJ identified what type of evidence would have been sufficient to bolster plaintiff's allegations.

---

[14] *See generally Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) ("The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of [a] headache is an indication that a patient's prostate cancer is not advanced."); *O'Brien v. Berryhill*, No. 17 C 0272, 2017 WL 4921960, at *5 (N.D. Ill. Oct. 31, 2017) ("[T]he ALJ did not explain how a finding of normal range of motion, normal gait, 5/5 motor strength, and a neurological examination within normal limits is inconsistent with the debilitating pain associated with fibromyalgia. There is no evidence that fibromyalgia causes limitations in strength, range of motion, or an inability to walk."); *Meade v. Colvin*, No. 3:12-CV-245, 2013 WL 5498263, at *11 (N.D. Ind. Sept. 30, 2011) (ALJ's "repeated references to the fact that [the plaintiff] had full range of motion in all joints and that her joints were not swollen" was "troubling" because swelling of the joints is not a symptom of fibromyalgia).
[15] *Rose v. Hartford Financial Services Group, Inc.*, 268 Fed. Appx. 444 (6th Cir. 2008); *Boardman v. The Prudential Ins. Co. of Am.*, 337 F.3d 9 (1st Cir. 2003).

**Friend Testimony.** Plaintiff complains that the ALJ cursorily dismissed the testimony of two friends who confirmed her subjective allegations of having good and bad days and her other symptoms. One of the witnesses (Jamie Wilkens) testified at the 2017 hearing, and the other (Renee Palmer) at the 2014 hearing. Ms. Wilkens was a friend of 27 years who saw plaintiff in person every few months and who talked to her on the telephone "three to four times a day." R. 1011-12. Ms. Wilkens remembered plaintiff describing many "bad days" where she couldn't "do anything" and would "just leave [her] feet up." R. 1012. At the 2014 hearing, Ms. Palmer testified that she had known plaintiff for four years, lived next door, and saw plaintiff every day or every other day. R. 589. She observed plaintiff's feet swelling, saw her sitting in a recliner to elevate her feet, and saw her having bad days "quite often." R. 590-91.

The ALJ did not explicitly acknowledge Ms. Palmer's testimony, although the ALJ generically referred to plaintiff's "friends" (plural). So it is not clear whether the ALJ was aware of, and considered, Ms. Palmer's testimony. As for Ms. Wilkens, the ALJ ambiguously stated that her testimony was "generally consistent" with plaintiff's testimony. R. 994. This statement suggests that the ALJ found this testimony to be credible. But if so, the ALJ gave plaintiff no benefit from this finding because, as noted previously, the ALJ elsewhere in the opinion doubted plaintiff's testimony about issues such as whether she had any bad days or needed to elevate her feet. This analysis is internally inconsistent. This is another repeated error supporting remand.

**Treatment History.** Plaintiff complains the ALJ did not recognize that she "tried and failed multiple modalities of medication management" and that her medications had to be "continually adjusted to combat her symptoms." Dkt. #18 at 19. This argument was also raised in the prior appeals. Treatment history is an important factor in any credibility analysis.[16] The

---

[16] *See, e.g., Heeman v. Astrue*, 414 Fed. Appx. 864, 868 (7th Cir. 2011) ("what is significant here [] is the improbability that Heeman would have undergone all the procedures he did, including the trial insertion

present ALJ decision still does not address this question in an explicit or systematic way. The long narrative section does refer to various treatments. But the picture presented is a mixed one, with some treatments seemingly helping for a time, some not helping, and some being re-tried years later. Plaintiff tried Lyrica, Diclofenac, Methotrexate, Indocin, Amitriptyline, Gabapentin, and Norco (among other medications), but experienced side effects, such as a toxic reaction to Methotrexate. Dkt. #18 at 19. The ALJ did not address the important question of whether these treatments were conservative or whether other treatments existed that could help plaintiff.

The Government points out a few instances in the record suggesting that plaintiff's treatment was working. For example, the government notes that, in February 2013, Dr. Gregg noted that plaintiff's fibromyalgia was "adequately controlled through her medication regimen with her primary care physician." Dkt. #27 at 8; R. 987. But this argument is not fully developed and can be criticized as cherry-picking. If the treatment was working, then why were there so many more doctor visits and new treatments?  Neither the Government nor the ALJ confronts the larger arc of the treatment history. This issue ties back to plaintiff's argument that her symptoms fluctuated and that a permanent and stable solution remained elusively out of reach. At this point, the Court cannot state that plaintiff's view of this treatment history is necessarily the only reasonable one, but the Court does note that, for the third time, the ALJ failed to meaningfully grapple with this argument. It is an important issue in almost every credibility analysis.

**Dr. Crowe's Opinion.** Dr. Crowe was a treating physician who completed a four-page RFC questionnaire. Ex. 8F. The two key findings here are that plaintiff would have to elevate her

---

of a spinal stimulator, his physical therapy, and his heavy medications, just to create the impression that he was experiencing pain."); *Goble v. Astrue*, 385 Fed. Appx.  588, 591 (7th Cir. 2010) ("We have deemed it improbable that a claimant would undergo pain-treatment procedures such as heavy doses of strong drugs in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking.").

leg 90 degrees for 40% of the work day and would miss more than four days a month. The former relates to the edema and the latter to the fibromyalgia.

In this appeal, plaintiff again argues, as she did twice before, that the ALJ cursorily rejected this opinion. To counter the ALJ's claim that Dr. Crowe's opinion was not supported by any record evidence, plaintiff has included a long paragraph filled with record citations supposedly corroborating Dr. Crowe's opinion (hereinafter, creatively labeled "The Long Paragraph"). Dkt. #18 at 27-28. The Long Paragraph lists various complaints plaintiff made and sought treatment for, such as shoulder pain, pelvic pain, tenderness in many body parts, swelling in various places, limited range of motion, severe edema, and other findings. The Long Paragraph was included in plaintiff's first appeal (*see* Case No. 13-50007, Dkt. #11 at 14-15); it then reemerged almost verbatim in the second appeal (*see* Case No. 15-50248, Dkt. #15 at 23-24); and it finally was again reprised here in this third appeal. The Long Paragraph has reappeared almost as often as Minnie Minoso reappeared in a White Sox uniform. But none of the three ALJ decisions has confronted the evidence contained in it. The ALJ should tackle this evidence head on, by acknowledging and analyzing it. At the same time, the Court notes that it would have strengthened plaintiff's argument if her counsel had pointed out this evidence more forcefully at the three administrative hearings.

Another problem is that none of the ALJ decisions follow the treating physician rule. Plaintiff raised this error in her last appeal, although she curiously omits it from the current appeal. In this Court's 2017 opinion, the Court noted this failure on the ALJ's part and also the Government's recognition of it. *See* R. 1107 ("The Government wisely concedes that the ALJ failed to follow this rule.") The ALJ's opinion here again does not apply this rule. The ALJ made a few indirect references to the rule. For example, the ALJ stated that Dr. Crowe was

plaintiff's "longstanding treating physician." R. 993. But the ALJ's implication was that this was a negative, which is contrary to the SSA's own rulings. Moreover, as is often the case, the ALJ's weighing analysis is contradictory. He gives more weight to Dr. Jilhewar, who is the ME and who never treated plaintiff, than to Dr. Crowe, the physician with the longest relationship with plaintiff, and then gives "very little weight" to the opinion of Dr. O'Laughlin because he was a "onetime examiner." Dr. O'Laughlin's "onetime" is still more than Dr. Jilhewar's never. More perplexing is that the ALJ accepted Dr. Jilhewar's opinion when Dr. Jilhewar repeatedly stated that he saw no evidence of 3+ edema in the records, when there were at least two records establishing this fact. So, the ALJ gave the most weight to the physician who failed to find critical evidence in the record and who based his opinion upon that supposed lack of record evidence. The ALJ should properly, systematically, and explicitly apply both steps of the rule as well as the checklist as required by the SSA's own rules.

In rejecting Dr. Crowe's opinion, the ALJ focused heavily on the edema issue and also placed significance on the fact that no synovitis was found. The Court has already discussed these two shortcomings.

In sum, the ALJ still has not adequately analyzed Dr. Crowe's opinion. Among other things, the ALJ should explicitly apply the treating physician rule; should consider all aspects of Dr. Crowe's opinion including the finding that plaintiff would miss four or more days a month due to the *cumulative* effect of all her impairments, not just from the leg swelling; and should dig deeper into the question of whether the objective evidence supported Dr. Crowe's opinion, including addressing the evidence set forth in The Long Paragraph.

**Edema.** Based on the above analysis, the Court finds that a remand is warranted. This conclusion does not rest on any errors relating to the edema analysis. In general, the ALJ's

discussion of this impairment was minimally stronger in that it rests on the explicit testimony of the medical expert (Dr. Jilhewar). But there are still obvious errors and unresolved questions.

To summarize, Dr. Jilhewar adopted a bright-line rule in analyzing whether plaintiff's edema would make it impossible to work. He announced, right at the beginning of his testimony, that no doctor found that plaintiff's leg swelling reached the 3+ level on a numerical scale used to assess pitting edema. This premise was faulty. Two such findings exist in the record. He then took the position that, if a person only had swelling rated at 2+ or lower, then that was merely "cosmetic" swelling and could not "have any effect on residual functional capacity." R. 1030. On the question of how to treat the leg swelling, Dr. Jilhewar stated that he did not see any "documentation that [plaintiff] needs to elevate the leg during the working hours" or "documentation that she needs to use the [lymphedema] pump during working hours."[17] R. 1037. He later stated that he did not find a "prescription" for the elevation of plaintiff's legs. R. 1040. On cross-examination, plaintiff's counsel asked Dr. Jilhewar about the fact that her doctors had prescribed compression boots, and Dr. Jilhewar agreed that "usually" compression boots are not prescribed unless the swelling is 3+ or more, but then he immediately fell back on his earlier incorrect conclusion that he found no evidence of any 3+ finding. R. 1041.

The ALJ relied on Dr. Jilhewar's testimony. In addition, the ALJ relied on a few statements in the record stating that plaintiff's leg swelling "became worse over the course of the day if she spent several hours on her feet." R. 992.

Plaintiff criticizes both Dr. Jilhewar's and the ALJ's analyses. Plaintiff complains that Dr. Jilhewar's reliance on the bright-line 3+ rule was too narrow and failed to account for some

---

[17] Though the parties did not clarify this point in their briefs, it is this Court's working assumption that the compression boots and the compression pump are part of the same apparatus.

findings by doctors that her edema was "severe."[18] *See* R. 493. However, on this particular question, plaintiff has not pointed to any source (such as a medical opinion or treatise) stating that the Dr. Jilhewar's approach was improper. Still, on remand, this issue should be explored further. Neither the ALJ nor the parties have provided background on the general issue of how to evaluate edema. Is this numerical scale well-recognized and is it considered to be dispositive, in the way Dr. Jilhewar suggested?

Other unresolved questions exist regarding the remedies plaintiff was using for the leg swelling and whether they were recommended by her doctors and in what situations and how frequently they were used. The factual record needs more development. The three main remedies appear to be leg elevation, compression boots, and simply staying off her feet. As noted above, the ALJ seemed to believe that plaintiff would not have to elevate her leg at all during an 8-hour workday (the ALJ included no RFC limitation for it) because plaintiff would be able to stay off her feet during the work day. This conclusion rests on two ambiguous statements that plaintiff believes were cherrypicked from the record. She argues that, although excessive standing and walking *aggravated* her leg swelling, they were not the *only* causes. As a result, plaintiff argues that doing a sedentary job was not the simple solution the ALJ believed it was. Moreover, the ALJ's RFC finding assumes plaintiff would be able to stand or walk two hours out of the day. Unless the standing or walking were all done in the last two hours of the work day, this would presumably mean that plaintiff would have some swelling while on the job, which in turn would require her to take some remedial measures during the day.

---

[18] As indicated previously, Dr. Jilhewar was incorrect in stating that no 3+ findings were made. Two were made, one 2010 and one in 2017. However, the ALJ acknowledged that Dr. Jilhewar missed these two findings but argued that they were not enough to establish "significant" edema on a "consistent and continuing" basis. R. 992.

Another issue concerns the compression boots. At the 2017 hearing, plaintiff testified that she was wearing compression boots that went all the way up to her hips, that the pressure had been increased to 50 psi, and that the boots only reduced the swelling for 45 minutes. R. 1020. Based on this testimony, it is unclear whether plaintiff would have to use the boots during the workday. If she did, then they would presumably prevent her from working capably, although this conclusion is not firmly established. These factual questions need further development.

For all the above reasons, the Court finds that questions remain regarding the edema issues. The Court notes, however, that the ALJ relied more heavily on Dr. Jilhewar's testimony as to plaintiff's edema. Plaintiff's edema arguments are weakened somewhat by the fact that, other than Dr. Crowe's opinion from 2010, she has no clear statement from a treating physician regarding the need to elevate her legs or wear compression boots at certain times. On the other hand, Dr. Jilhewar's insistence that there must be a "prescription" for leg elevation seems unrealistic. Is this something that a doctor would issue a written prescription for?

\*    \*    \*

The final question to be addressed is whether this Court should merely remand this case for a new hearing and decision, as has been done twice before, or whether the Court should order the Commissioner to award plaintiff benefits outright.

Plaintiff raised this argument in the last paragraph (page 30) of her opening brief. She cited to two cases to support the claim that this Court has the authority to order such a remedy. The primary case was *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) where the Seventh Circuit found that the ALJ had failed to follow the Seventh Circuit's previous remand ruling, made three years earlier, and again committed the same basic errors. *Id.* at 802. The Seventh Circuit noted that the ALJ's decision "makes no reference to our opinion and it is unclear

whether this administrate law judge ever saw it." *Id.* The Court found that the Agency was obdurate in not following the remand instructions and making the same errors twice. Based on the finding of "obduracy," the Court declared it was time "to bring the charade to an end," and ordered the Agency to award the claimant "the benefits that she applied for." *Id.* at 801. The other case plaintiff cited was a district court case—*Briscoe v. Barnhart*, 309 F.Supp.2d 1025, 1042 (N.D. Ill. 2004)—a case relying on *Wilder* to order an award of benefits. Based on these cases, plaintiff argues that the Commissioner has been obdurate and should be penalized for it.

The Government did not respond to this portion of plaintiff's argument. The Court, therefore, does not have the benefit of the Government's position on whether this Court has the power to remand with an order to award benefits outright and, if so, what criteria must be met. A second problem is that plaintiff's argument is not well developed. In particular, plaintiff's argument is weakened considerably by the fact that the *Briscoe* decision she cited, a district court ruling, was overturned on appeal. *See Briscoe v. Barnhart*, 425 F.3d 435 (7th Cir. 2005). There, the Seventh Circuit made clear that the *Wilder* decision was limited—specifically, the Seventh Circuit stated that "*Wilder* did not hold [] that obduracy alone could ever warrant an award of benefits." *Id.* at 356. Instead, the Seventh Circuit held that the *Wilder* case also satisfied a second requirement, which was that the medical evidence corroborating plaintiff's claim was "uncontradicted," meaning that there were "no reasonable" arguments for finding that plaintiff was not disabled. *Id.*

Here, the Court would have no trouble finding that the SSA, as a whole, was obdurate in repeatedly failing to correct the errors or follow this Court's remand instructions. Over a many year period, the same arguments keep arising making this quintessential *Groundhog Day* litigation. The ALJ ignored specific remand instructions from this Court, instructions reflecting

well-known holdings from Seventh Circuit case law. It would be difficult for anyone to contest the proposition that three administrative hearings and three ALJ decisions should be enough. Viewing the 10-year history of this case, the Court does not hold out great hope that a fourth hearing and decision will lead to greater clarity. Over the course of this litigation, the ALJ decisions have certainly gotten longer each go round (10 pages, then 18, and now 23), as have the briefs (plaintiff's opening brief has grown from 16 to 25 to now 30 pages), but it still feels like it's just 6:00 a.m. all over again, which is why plaintiff's suggestion that this Court end this case now is appealing.

However, the Court does not believe that the evidence is uncontradicted or can yield only one conclusion, as *Briscoe* requires. For this reason, the Court is not persuaded that it has the authority to order benefits outright. The decision to again remand this case is obviously not a satisfying outcome.

On remand, the Court directs that the SSA order the new ALJ to read this decision in its entirety, as well as this Court's 2017 decision, as well as the three prior ALJ decisions, and that the ALJ explicitly summarize these holdings and acknowledge that this review has been conducted. Further, the ALJ obviously should explicitly address all the issues raised herein, and any other issues that the ALJ believes need to be addressed to meet the legal standards. Also, the ALJ must call a rheumatologist as an expert witness. Correspondingly, the Court requires that plaintiff's counsel explicitly raise all her arguments at the new hearing and point out to the ALJ any evidence she believes is important to her case. Failure to explicitly raise these arguments will result in a finding of waiver in any subsequent appeal.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted; the government's motion is denied; and this case is remanded for further consideration.

Date: August 26, 2019                    By: _____
                                              Iain D. Johnston
                                              United States Magistrate Judge